# Richmond

CARSON ALVIN JONES V. COMMONWEALTH OF VIRGINIA

September 2, 1976.

Record No. 751063.

Present, All the Justices.

*Willard R. Finney*, for plaintiff in error.

*Jerry P. Slonaker, Assistant Attorney General* (*Andrew P. Miller, Attorney General*, on brief), for defendant in error.

CARRICO, J., delivered the opinion of the court.

This case is sequel to *Jones* v. *Commonwealth*, 217 Va. 226, 228 S.E.2d 124 (1976), and involves the same defendant, Carson Alvin

Jones, and the same shooting incident. With a single shotgun blast, the defendant killed Billy Hugh Sutphin and wounded Jeral Lee Gillispie. In the earlier case, the defendant was tried by jury for murder but found guilty of involuntary manslaughter in the death of Sutphin. In a later jury trial in the present case, the defendant was convicted of the malicious wounding of Gillispie and, in accordance with the jury's verdict, was sentenced to a term of 16 years in the penitentiary.

On appeal, the defendant contends that the trial court should have dismissed the indictment against him for the malicious wounding of Gillispie. In the prosecution of the malicious wounding charge, the defendant says, the crucial issue was whether he shot Gillispie with intent to maim, disfigure, disable, or kill (Code § 18.1-65, now § 18.2-51). But, the defendant asserts, because the same shot that wounded Gillispie also killed Sutphin, the prior verdict of involuntary manslaughter established that the killing of Sutphin and the wounding of Gillispie were without malicious intent.

In refusing to dismiss the malicious wounding indictment, the defendant argues, the trial court permitted the Commonwealth to retry the issue of intent and, using the same evidence that was used against him at the prior trial, to convict him of a crime whose essential element is the intent to do bodily harm. The first jury, however, the defendant says, had "returned a verdict that he was not guilty of any intent to any bodily harm." This, the defendant contends, "flies against" the collateral estoppel doctrine "as included in the double jeopardy provision of the Fifth Amendment."

The defendant relies upon *Ashe v. Swenson*, 397 U.S. 436 (1970), where the United States Supreme Court stated that the doctrine of collateral estoppel means that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." 397 U.S. at 443. The rule of collateral estoppel is a constitutional requirement embodied in the Fifth Amendment protection against double jeopardy, the Court held, and is applicable to the states under the ruling in *Benton v. Maryland*, 395 U.S. 784 (1969).

In *Ashe*, six participants in a poker game had been robbed by three or four masked gunmen. Ashe, one of the alleged assailants, was tried by jury in a Missouri state court for the robbery of one of the poker players. The sole issue was the identity of Ashe as one of the assailants. The jury acquitted Ashe. Later tried by jury for the robbery of another of the poker players, Ashe was convicted. The Supreme

Court held that because the first jury by its verdict had determined that Ashe was not one of the robbers, the state, under principles of collateral estoppel, could not "constitutionally hale him before a new jury to litigate that issue again." 397 U.S. at 446.

The decision in *Ashe* has resulted in a multitude of cases involving myriad factual situations upon which defendants have sought to invoke the doctrine of collateral estoppel. Citation of the many cases would be unduly burdensome and would serve no useful purpose. Suffice to say, the numerous attempts to invoke the doctrine have met with little success, a result that was easily predictable. As the Second Circuit Court of Appeals has stated, *Ashe* "was the rare case where it was possible to determine with certainty what the jury in the earlier prosecution had decided." *United States* v. *Cioffi*, 487 F.2d 492, 498 (1973), *cert. denied*, 416 U.S. 995 (1974). And, as the Second Circuit has observed in another case, "Since it is usually impossible to determine with any precision upon what basis the jury reached a verdict in a criminal case, it is a rare situation in which the collateral estoppel defense will be available to a defendant." *United States* v. *Tramunti*, 500 F.2d 1334, 1346, *cert. denied*, 419 U.S. 1079 (1974).

*Ashe* requires that the question whether the rule of collateral estoppel applies in a given case is to be approached "with realism and rationality." The Court established these guidelines: "Where a previous judgment of acquittal was based upon a general verdict, as is usually the case, this [realistic and rational] approach requires a court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'" 397 U.S. at 444. Or, as more succinctly stated by the Second Circuit in *Tramunti, supra*:

> "In order to establish that the present prosecution is barred by the previous acquittal . . . the burden is on the appellant to show that the verdict there *necessarily* decided the issues now in litigation." 500 F.2d at 1346.

With these principles in mind, we now examine the record of the prior trial. In that proceeding, the defendant was tried upon an indictment for murder in the death of Sutphin. The record shows that the shooting incident which resulted in the death of Sutphin and the wounding of Gillispie occurred December 22, 1974, at the home of the defendant in Franklin County.

The evidence was in sharp and near-hopeless conflict. According to the Commonwealth's evidence, in the afternoon of December 22, Jeral Lee Gillispie and Sam Gillispie, who were brothers-in-law, and Billy Hugh Sutphin, who was Sam's son-in-law, went to the defendant's home to purchase bootleg whiskey. The defendant, his father, and others were present in the "main room" of the home, and a card game was in progress. After arrival of the Gillispies and Sutphin, a half-gallon jar of bootleg whiskey was passed around and "all [present] was drinking."

Sam Gillispie asked to purchase a jar of the bootleg whiskey. He "counted . . . out" eight dollars to Hugh Wagner, who gave the money to the defendant. Wagner asked the defendant "was it all right" to sell the whiskey. The defendant made some statement, and Wagner went outside. Whereupon, the defendant "jumped up from the table and went in the bedroom and come back with his shotgun." The defendant cursed Sam and said to him, "I'm gone kill you if you got a gun." The defendant searched Sam but found no weapon. The defendant's father then interceded, and the defendant "knocked him out of the way with the gun, and the gun went off and went through the wall." The defendant fired a second time, the shot striking Jeral Gillispie and Billy Hugh Sutphin.

The defendant claimed the shooting was in self-defense. According to his testimony, Jeral and Sam Gillispie had visited his home the day preceding the shooting, at which time both Gillispies were armed and "belligerent and abusive." When they departed, the defendant heard one of them say, "Well, we'll come back and finish what we started tomorrow."

On the day of the shooting, according to the defendant, the Gillispies arrived at the defendant's home accompanied by Sutphin, and all three were armed, intoxicated, and abusive. When Sam Gillispie introduced Sutphin as his son-in-law, the defendant said, "Well, ya'll come up here yesterday and caused trouble. I don't want it started today." The Gillispies and Sutphin, however, continued drinking and "arguing and cussing." The defendant asked them to leave, but they refused. Jeral Gillispie "patted his gun and laughed and said they didn't have to go nowhere." The defendant then went to his bedroom and secured his shotgun. Upon his return, Jeral said the shotgun "won't shoot," and the defendant fired into the wall to prove "the gun would go off." Jerald remarked that he had "something to take care of it" and, with his hand in his pocket, advanced toward the defendant. At the same time, Sutphin, who was behind Jeral, also advanced

toward the defendant and "went with his right hand for his gun." The defendant shot Jeral "before he could get [his gun] out." Jeral and Sutphin fell "side by side."

Sutphin was dead when the police arrived. The record is silent whether the police searched Sutphin's body for weapons. The defendant, in his testimony, suggested that Sam Gillispie, after the shooting, might have removed a weapon from Sutphin's body. Jeral and Sam Gillispie both testified that they never carried guns and that they were not armed at the time of the shooting.

At the conclusion of the evidence at the prior trial, the jury was instructed that it could find the defendant guilty of murder of the first or second degree or of voluntary or involuntary manslaughter or that it could return a verdict of not guilty. The defendant's theory of self-defense was fully presented to the jury by appropriate instructions.

In finding the defendant guilty of involuntary manslaughter, the jury acquitted him of the greater charges of murder and voluntary manslaughter. *Taylor v. Commonwealth*, 186 Va. 587, 592, 43 S.E.2d 906, 909 (1947). The jury also, however, rejected the defendant's plea of self-defense and held him criminally responsible for the death of Sutphin.

Unlike *Ashe v. Swenson, supra,* this is not one of those rare cases where it is possible to determine with certainty what the jury in the earlier prosecution decided. Indeed, it is quite impossible to determine upon what basis the jury in the prior trial, having determined that the defendant was criminally responsible for the death of Sutphin, decided that he was guilty only of involuntary manslaughter rather than murder.[1]

We must, however, take the verdict as it was rendered and accept the concomitant finding that the killing of Sutphin was without malicious intent. But does it follow that the first jury necessarily determined that the wounding of Gillispie also was without malicious intent? We believe not.

In the prior trial, the jury was instructed that involuntary manslaughter "is the killing of one accidentally, contrary to the intention of the defendant, while in the prosecution of some unlawful, but not felonious, act." The defendant contends that in convicting him only

---

[1] This does not mean that the verdict of involuntary manslaughter was invalid. The verdict of a jury finding an accused guilty of a lesser degree of homicide will not be disturbed even though the evidence tends to prove him guilty of a higher degree. *See Taylor v. Commonwealth, supra,* 186 Va. at 590, 43 S.E.2d at 908.

of involuntary manslaughter, the jury not only found that he did not intend to kill Sutphin but also necessarily found that his wounding of Gillispie was without malicious intent and that "he was not performing any felonious act." The Commonwealth was collaterally estopped, therefore, the defendant says, from showing in the trial of the present case that his wounding of Gillispie was a felonious act with malicious intent.

The instructions that were given the jury in the prior trial, however, related solely to the killing of Sutphin; the wounding of Gillispie was not mentioned, directly or indirectly. Specifically, the jury was not instructed on the theory of transferred intent, *viz.*, that if the defendant shot Gillispie with intent to kill, the same intent would have followed the bullet and would have been transferred to the killing of Sutphin, even if the death of Sutphin was unintentional or accidental. *See State v. Clifford*, 59 W.Va. 1, 29-30, 52 S.E. 981, 993 (1906). Without such an instruction, the defendant's intent and his actions with respect to the wounding of Gillispie really were not issues at the prior trial; the jury in that trial was free to determine the defendant's intent with respect to the killing of Sutphin without necessarily determining his intent with respect to the wounding of Gillispie.

Under the evidence at the prior trial, the jury was entitled to believe that Sutphin was a mere bystander accidentally struck by the shotgun blast intended for Gillispie. The testimony of the Commonwealth's two eyewitnesses, Sam and Jeral Gillispie, clearly showed that Sutphin was a mere bystander, innocent of any wrongdoing toward the defendant. One of the defense witnesses even admitted that Sutphin "was just standing there . . . not doing anything" when he was shot.

The defendant, of course, pictured Sutphin as an assailant in an attempt to justify the killing by reason of self-defense. But the defendant's testimony did not establish as a matter of law that Sutphin was an assailant. Indeed, defense counsel stated to the trial court that it was "a Jury issue whether or not the Sutphin boy was a bystander or an assailant." And the jury obviously discredited the testimony that Sutphin was an assailant; it rejected the defendant's plea of self-defense.

The jury in the prior trial also was entitled to believe that because of the antecedent controversy between the defendant and Jeral Gillispie on the day preceding the shooting, in which Sutphin had no part, the defendant shot Gillispie with malicious intent. But in the

absence of an instruction on transferred intent, and with the instructions that were given, the jury was free to decide, without regard to the intent with which the defendant wounded Gillispie, that the killing of Sutphin, while felonious, was accidental or unintentional.

Consistent, therefore, with *Ashe* v. *Swenson, supra*, we can reasonably conclude from the record of the prior trial that, in the language of *Ashe*, "a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." 397 U.S. at 444. Accordingly, we reject the defendant's claim that the Commonwealth was collaterally estopped in the trial of the present case from showing that the wounding of Gillispie was with malicious intent.

For the reasons assigned, the judgment of the trial court will be affirmed.

*Affirmed.*