UNITED STATES of America, Appellant,

v.

Donnell FELDER, Appellee.

No. 87-871.

District of Columbia Court of Appeals.

Argued Oct. 27, 1987.
Decided Sept. 16, 1988.

---

Helen Bollwerk, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty. at the time the brief was filed, and Michael W. Farrell and Ronald Dixon, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellant.

David A. Reiser, Public Defender Service, with whom James Klein, Public Defender Service, Washington, D.C., was on the brief, for appellee.

Before NEWMAN and FERREN, Associate Judges, and GALLAGHER, Senior Judge.

NEWMAN, Associate Judge:

In this case, we are called upon to determine whether the doctrine of collateral estoppel as a component of the Double Jeopardy Clause of the Fifth Amendment as enunciated in *Ashe v. Swenson*, 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), and its progeny prevents the government from relitigating certain facts at a second trial. The trial court ruled that the government was barred from such relitigation. We review the matter *de novo* and agree with the ruling of the trial court; we affirm.

Felder was tried by a jury on an indictment charging felony murder while armed, attempted robbery while armed, and carrying a pistol without a license. The jury returned a verdict of not guilty on the offense of carrying a pistol without a license. When the jury was ultimately unable to reach a unanimous verdict on the felony murder (as well as second degree murder which had been submitted as a lesser included offense of felony murder) and attempted robbery counts, the trial court declared a mistrial on those charges.

Prior to the scheduled retrial, Felder filed a motion seeking to bar the government from relitigating those facts necessarily disposed of favorably to Felder by his acquittal of carrying a pistol without a license. The government filed opposition and a hearing was held. After taking the matter under advisement, Judge Walton granted Felder's motion. The government appealed.

### I. The Evidence At Trial

A review of the evidence presented at trial as well as the positions urged by the United States during trial is necessary to our *Ashe v. Swenson* analysis. The killing at issue in this case arose out of an attempt to rob a drug dealer which went awry. The government's evidence tended to show that Felder proposed to Bellinger that they rob a cocaine dealer. Bellinger agreed. Shortly thereafter, Myles (a friend of Bellinger's) arrived on the scene. Myles agreed to join the plan and exhibited a .22 caliber magnum Ruger revolver, which was tucked in his belt. The three persons travelled to the intended crime scene only to find that the drug dealer Felder had suggested they rob was nowhere to be found. Unfortunately for Gantt, as his killing demonstrates, he was present. According to Bellinger[1], Gantt was selling marijuana.

---

1. Pursuant to a plea bargain, Bellinger pled guilty to manslaughter while armed and at-

Gantt was about five yards from where Felder and Myles were standing. As Gantt turned to walk out of the area, Felder signalled Bellinger that the new robbery target was Gantt. Felder grabbed Gantt by the collar, but Gantt broke away and ran towards Bellinger. As Gantt ran, Bellinger said Felder shot Gantt in the back with the gun he had previously seen in Myles belt. Bellinger, Felder, and Myles all fled to a nearby apartment occupied by a woman Felder knew, Ruby Newton.

Jessie Penn also witnessed Gantt being shot and testified at trial. According to Penn, Gantt had previously been in a crap game where he had won. Bellinger had also been at the crap game. When Gantt left the crap game with his winnings, he was confronted by Bellinger. Bellinger and Gantt struggled; it appeared that Bellinger was trying to rob Gantt. While the struggle was continuing between Bellinger and Gantt, Felder and Myles were standing some distance away. Felder called out to Bellinger. Thereafter, Felder, who was near the top of some steps eighteen to twenty-one feet away, shot Gantt in the back. The three cohorts fled. Gantt later died of the gunshot.

Ruby Newton, to whose apartment Felder and the others fled, testified that Felder stated that they had just tried to rob a guy around the corner and that he left "his gun" around there. Because of events taking place at the Newton apartment, Felder and the other two men soon left that location, making their separate ways home.

Sometime later, during the arrest of Myles for an unrelated offense, the police seized a .22 caliber Ruger revolver. A subsequent test demonstrated that it was operable and that it was the weapon used to kill Gantt. An expert witness, Phillips, who examined the gun and the coat Gantt was wearing the night he was killed, testified that the gun had to have been within one inch of Gantt's coat when it was fired to produce the effect he observed. The government proved that Felder did not have a license to carry a pistol.

In his defense, Felder testified that he was innocently present on the scene where he saw Bellinger and Myles standing side by side with another man. Bellinger was "interlocked" struggling with this third man. Two or three seconds later he heard a shot and ran to Newton's apartment. Felder denied any participation in planning or attempting to carry out the robbery while armed; he further denied shooting Gantt or having a gun in his possession on the relevant date.

## II. Argument and Instruction

The government told the jury in its opening statement that it would prove that Felder was the triggerman:

> Mr. Gantt tussles, turns, breaks away, and is running away from Mr. Felder, with his back to Mr. Felder. He made one step, he made two steps, and then the driving force behind this agreement [to commit a robbery] pulled out the .22 long barrel six shot western style revolver and fired one shot into the back of Ruben Gantt who was running away from him.

The government also told the jury in its opening statement that the evidence would show that when the three men arrived at the Newton apartment, Felder was "nervous and upset for a greater reason" than Bellinger and Myles "because he pulled the trigger." The prosecutor, in explaining the evidence it would present on the carrying a pistol without a license offense, told the jury that Bellinger's testimony would put "that pistol right in the hand of Donnell Felder pulling the trigger."

As it indicated it would in its opening statement, the government presented its case to the jury on the theory that Felder was the triggerman. It did so by presenting the testimony of Bellinger and Penn, both who identified Felder as the triggerman. In addition, it presented testimony by Newton who testified to admissions made by Felder, which, the government urged, tended to suggest he was the triggerman. The testimony of Newton was

tempted robbery in return for his truthful testimony. The jury was informed of the details of the plea bargain; Felder cross-examined him about it at length.

impeached by defense testimony that Newton was an habitual drug user who was freebasing cocaine when Felder and the others arrived at her apartment on the day in question.

The testimony of the expert, Phillips, that the shot that had killed Gantt had been fired from a distance no greater than one inch from Gantt, i.e., it was likely a contact shot, presented a problem to the government's theory that Felder was the triggerman. Bellinger testified that Felder shot Gantt as Gantt was running away from Felder toward Bellinger. Indeed, Bellinger testified that he was surprised that Felder shot Gantt when Bellinger was in the line of fire. The other government eye-witness, Penn, puts Felder eighteen to twenty-one feet from Gantt when, Penn says, Felder shot Gantt. Both these versions (Bellinger's and Penn's) seem to be at odds with the expert testimony presented by the government's own expert about a contact shooting. On the other hand, a contact shooting by Bellinger was consistent with the testimony of Felder in his own defense that he heard a gunshot shortly after seeing Bellinger "interlocked," struggling with Gantt.

With the case in this posture, the court met with counsel to settle instructions. The government requested that the court instruct the jury on second-degree murder as a lesser included offense of felony murder. Felder objected. The court overruled the objection.[2] The government also asked for an aiding and abetting instruction since the prosecutor stated he intended to ask the jury to convict Felder on alternative theories—either as the triggerman or as an aider and abettor of the triggerman. Based on this position of the government, Felder requested a special unanimity instruction. The trial court denied this request. The court gave the standard instructions on all the offenses as well as aiding and abetting. In addition, the court said it would instruct on accomplice liability to the charge of felony murder. The instruction on the offense of carrying a pistol without a license said:

The essential elements of the offense of carrying a pistol without a license, each of which the Government must prove beyond a reasonable doubt, are:

1. That the defendant carried openly or concealed on or about his person, a pistol;

2. That the pistol was operable;

3. That the defendant was not licensed to carry the pistol by the Chief of Police of the District of Columbia; and

4. That he had the intent to do the acts which constitute the carrying of a pistol without a license.

Criminal Jury Instructions for the District of Columbia, No. 4.81 (3d ed. 1978).

In closing argument, the government urged the jury to convict Felder on the theory that he was the triggerman. Alternatively, the prosecutor urged the jury to convict Felder of felony murder, even if it was not satisfied that he was the triggerman since the evidence indicated he at least aided and abetted the attempted armed robbery of Gantt, which resulted in Gantt's death.

### III. Jury Proceedings

After the court had instructed as it said it would, the jury retired to deliberate. After several hours of deliberation, the jury sent the court two notes, the sum of which requested reinstruction on aiding and abetting. The trial court complied with the request. Thereafter, the jury requested reinstruction on felony murder and second-degree murder. The trial court reinstructed the jury on the elements of these offenses. Subsequently, the jury returned its verdict of not guilty of carrying a pistol without a license; it reported itself hopelessly deadlocked on the remaining charges. The court declared a mistrial as to these counts. The not guilty verdict was duly entered.

### IV. Standard of Review

#### A.

■ The first question we must answer is what is our measure of review of the trial court's ruling. The United States, citing among other cases, *Miller v. Fenton,*

---

2. The correctness of this ruling is not before us. We express no opinion about it.

474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985), urges that the trial court's ruling is solely one of law and our review is *de novo*. Alternatively, it suggested that if we deem the issue to be a mixed question of fact and law, the ultimate question of whether the collateral estoppel bar applies is a legal question which we must review *de novo*. On the other side, Felder, without stating his view clearly, citing us to *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), urges us to give "some deference" to Judge Walton's ruling given his "experience as a trial judge." We note that this is an issue we have not previously decided. Nor has the Supreme Court or any United States Court of Appeals done so explicitly. Likewise, we find no square holding on this point in any state supreme court.

### B.

Standards of review classically have been governed by whether the matter under review is a question of fact, a question of law, a mixed question of law and fact, or a matter committed to the trial court's discretion. A question of fact has been defined as the "basic, primary, [subsidiary], or historical facts: facts 'in the sense of recital of external events and credibility of their narrators....'" *Townsend v. Sain*, 372 U.S. 293, 309, n. 6, 83 S.Ct. 745, 755, n. 6, 9 L.Ed.2d 770 (1963) (quoting *Brown v. Allen*, 344 U.S. 443, 506, 73 S.Ct. 397, 445, 97 L.Ed. 469 (1953) (opinion of Mr. Justice Frankfurter)). And under the scheme for standards of review, a question of fact is reviewed under the highly deferential "clearly erroneous" standard. *See* D.C.Super.Ct.Civ.R. 52(a); FED.R.CIV.P. 52 (a);[3] D.C.Code § 17–305(a) (1981).[4] Specifically, this standard provides that, if, after reviewing the record, the appellate court concludes that there is more than one permissi-

ble view of the evidence on a factual issue, it must defer to the trial judge's choice among these views. *Anderson v. Bessemer City, supra,* 470 U.S. at 574, 105 S.Ct. at 1512; *United States v. Yellow Cab Co.,* 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949); *see Lee Washington, Inc. v. Washington Motor Truck Transport Employees Health & Welfare Trust,* 310 A.2d 604, 606 (D.C.1973).

By contrast, a question of law refers to the rule of law pertinent to the inquiry to be reviewed. *See United States v. McConney,* 728 F.2d 1195, 1202 (9th Cir.1984) (en banc). The trial court's resolution of a question of law is entitled to no deference and is reviewed "de novo" on appeal. This means that the reviewing court will make an independent judgment based upon an original appraisal of the record. *Bose Corp. v. Consumers Union of the United States, Inc.,* 466 U.S. 485, 514 n. 31, 104 S.Ct. 1949, 1967 n. 31, 80 L.Ed.2d 502 (1984).

"Mixed questions" of law and fact are those "questions in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard or put it another way, whether the rule of law is applied to the established facts is or is not violated." *Pullman–Standard v. Swint,* 456 U.S. 273, 289 n.19, 102 S.Ct. 1781, 1790 n.19, 72 L.Ed.2d 66 (1982). So-called "mixed questions" of law and fact are assigned, sometimes clumsily, either to the "clearly erroneous" or to the "de novo" category, depending, ostensibly, on whether the reviewing court regards the matter as more closely resembling a question of fact or a question of law. Although there is, therefore, authority for classifying "mixed questions" under either standard, *see id.,* many "mixed questions" are ac-

---

**3.** D.C.Super.Ct.Civ.R. 52(a) and FED.R.CIV.P. 52(a) both provide: "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

**4.** D.C. Code § 17–305(a) (1981), which requires, in pertinent part, that "the judgment [of the trial

court] may not be set aside ... unless it appears that the judgment is plainly wrong or without evidence to support it," has been regarded as indistinguishable from the "clearly erroneous" standard. *See, e.g., Auxier v. Kraisel,* 466 A.2d 416, 418 (D.C.1983) (per curiam); *Hummel v. Koehler,* 458 A.2d 1187, 1191 (D.C.1983).

corded "de novo" review. *See United States v. McConney, supra,* 728 F.2d 1195 (9th Cir.1984); *see also Cuyler v. Sullivan,* 446 U.S. 335, 342, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333 (1980) ("presumption of correctness" afforded by 28 U.S.C. § 2254(d) (1982) to state court factual findings on habeas review by federal court does not apply to "mixed questions" which are subject to independent review). It is also not uncommon for a court when confronted with what it regards as a "mixed question," to engage in some measure of unmixing, whereby subsidiary, fact-like issues, are reviewed under the "clearly erroneous" standard, and the ultimate, law-like issue, is reviewed "de novo." *See, e.g., Miller v. Fenton, supra,* 474 U.S. at 112, 117, 106 S.Ct. at 450–51, 453 (1985); *Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984); *Curry v. United States,* 498 A.2d 534, 540 (D.C. 1985).

Finally, when an appellate court reviews a decision of the trial court on a matter committed to the trial court's discretion, that decision will be reversed only for abuse of discretion. This *most* deferential standard of review allows the trial judge a "limited right to be wrong," Rosenberg, *Appellate Review of Trial Court Discretion,* 79 F.R.D. 173, 176 (1975). It also requires the appellate court to assure itself only that certain "indicia of rationality and fairness" have been met, *Johnson v. United States,* 398 A.2d 354, 362 (D.C.1979).

While there are general definitions relating to the fact/law dichotomy, and further, these categories suggest an analytical framework undergirding standards of review, the scheme described above "is often not an illuminating test and is never self-executing." *Baumgartner v. United States,* 322 U.S. 665, 671, 64 S.Ct. 1240, 1244, 88 L.Ed. 1525 (1944). Statutes and other rules governing standards of review do not provide any particular guidance, and courts have yet to arrive at any "rule of principle that will unerringly distinguish a factual finding from a legal conclusion." *Pullman–Standard, supra,* 456 U.S. at 288, 102 S.Ct. at 1790. Daunted by the "vexing," *id.,* and "elusive," *Miller, supra,* 474 U.S. at 113, 106 S.Ct. at 451, nature of the distinction as a conceptual matter, courts have begun to explore the "practical truth that the decision to label an issue a 'question of law,' a 'question of fact,' or a 'mixed question of law and fact' is sometimes as much a matter of allocation as it is of analysis." *Id.* at 113–14, 106 S.Ct. at 451–52. The result has been a recognition that "[a]t least in those instances in which the issue falls somewhere between a pristine legal standard and a simple historical fact, the fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question." *Id.* at 114, 106 S.Ct. at 452. It is our thesis that both analysis and allocation play appropriate and necessary roles in determining standards of review.

Standards of review originate in a variety of sources. Some, such as Rule 52(a), are enacted as court rules. Others are provided by such statutes as D.C.Code § 17–305 (1981), which defines the scope of review of this court,[5] and 28 U.S.C. § 2254(d) (1982), which governs federal habeas corpus review of state court factual findings.[6] In contrast, some standards of

---

**5.** *See supra* note 3. D.C. Code § 17–305(a) (1981) provides in full:

> In considering an order or judgment of a lower court (or any of its divisions or branches) brought before it for review, the District of Columbia Court of Appeals shall review the record on appeal. When the issues of fact were tried by jury, the court shall review the case only as to matters of law. When the case was tried without a jury, the court may review as to the facts and the law, but the judgment may not be set aside except for errors of law

unless it appears that the judgment is plainly wrong or without evidence to support it.

**6.** 28 U.S.C. § 2254(d) (1982) reads, in relevant part, as follows:

> In any proceeding instituted in Federal court by an application for a writ of habeas corpus by a person in custody pursuant to a judgment of a State court, a determination after a hearing on the merits of a factual issue made by a State court of competent jurisdiction ... evidenced by a written finding, written opin-

review are the product of judge-made rules. *See, e.g., Bose Corp., supra,* 466 U.S. 485, 104 S.Ct. 1949 (interpreting First Amendment to require independent appellate review of determination of "actual malice" in libel actions); Rosenberg, *supra,* 79 F.R.D. at 174–75 (whether a matter is committed to trial court's discretion may be determined by rule, statute or judicial decision). Sometimes when a court applies a standard of review, it acts expressly to construe one of these rules or statutes. *See, e.g., Pullman-Standard, supra* (construing FED.R. CIV.P. 52(a)); *Miller, supra,* (construing 28 U.S.C. § 2254(d) (1982)). Alternatively, a court may employ a familiar standard without explicit reference to a governing rule. *See, e.g., United States v. Burroughs,* 830 F.2d 1574 (11th Cir.1987) (reviewing an alleged *Brady* violation). And, at other times, a novel standard of review may be mustered on an *ad hoc* basis, often absent any real acknowledgement that something out of the ordinary is taking place. *See, e.g., United States v. Agurs,* 427 U.S. 97, 114, 96 S.Ct. 2392, 2402, 49 L.Ed.2d 342 (1976) (stating that "since after considering it [i.e., nondisclosed evidence by prosecution] in the context of respondent's guilt beyond a reasonable doubt, and since we are satisfied that his firsthand appraisal of the record was thorough and reasonable," there was no denial of a fair trial.).

We are convinced that there exists a kind of common law to standards of review, framed by fundamental conceptions about how authority should be divided between the court in which a matter is originally heard and the reviewing court or courts. These principles frequently transcend the characterization of a particular case as state or federal, civil or criminal, and thus we, as have other courts seeking direction in the formulation or application of standards of review, *see, e.g., Miller, supra,* 474 U.S. at 110–11, 106 S.Ct. at 449–50,

draw upon a broad range of sources to guide our inquiry.

■ Standards of review are, in effect, presumptions. Like all legal presumptions, and more transparently than most, they represent judgments about where the risk of an erroneous decision should lie. They are informed by policy and practice. Hence, a standard of review embodies either or both of the following considerations: (1) which judicial actor logically should be entrusted to the primary decisionmaker about a particular issue, in light of conceptions about the nature and significance of that issue in our legal system, and (2) which forum is, as a purely practical matter, more likely to render the decision with the higher degree of accuracy. The first approach, which we call "analytical," depends on an *a priori* categorization of the nature of the matter under review. The second approach, which we term "functional," focuses instead on which court, original or reviewing, has the best access to the tools and materials necessary to deciding the matter in question. *Compare McConney, supra.*[7]

To be sure, the analytical and functional approaches are not unrelated. Indeed, what separates law and fact as analytical categories may, in actuality, reflect a recognition of divergent roles between an appellate court and a trial court. In other words, questions that analytically would most likely be regarded as questions of fact are ordinarily those that can be answered by hearing testimony—a function in which only trial courts engage. On the other hand, questions that are regarded quintessentially as questions of law are precisely those to be resolved through reasoning, comparison with like cases, and review of a trial court record—tasks that the

---

ion, or other reliable and adequate written indicia, shall be presumed to be correct....

7. In *McConney, supra,* the court of appeals for the Ninth Circuit, in a case dealing with exigent circumstances which it viewed as a "mixed question" of law and fact, focused on the nature of the inquiry but characterized its analysis as a functional approach. Specifically, the court of

appeals stated that "we think that if we focus on the nature of the inquiry required in determining whether the established facts within the relevant legal definition, we employ a neutral test that accurately reflects the concerns that properly underlie standard of review jurisprudence." 728 F.2d at 1204.

appellate court is principally designed to undertake.

The competing roles that analysis and function play in regulating standards of review are illustrated by the operation of Rule 52(a). The functional basis for the "clearly erroneous" standard has long been recognized in the proposition that "the trial court's customary opportunity to evaluate the demeanor and thus the credibility of witnesses ... is the rationale behind Rule 52(a)," *United States v. General Motors Corp.*, 384 U.S. 127, 141 n. 16, 86 S.Ct. 1321, 1328 n. 16, 16 L.Ed.2d 415 (1966), a rule that by its terms adverts to the "opportunity of the trial court to judge of the credibility of the witnesses," FED.R.CIV.P. 52(a). The functional underpinnings of the Rule are also suggested by the principle that not all factual findings are entitled to equal weight upon review: "The conclusiveness of a 'finding of fact' depends on the nature of the materials on which the finding is based," *Baumgartner, supra,* 322 U.S. at 670–71, 64 S.Ct. at 1243, and has less significance in what is "essentially a 'paper case.'" *General Motors, supra,* 384 U.S. at 141 n. 16, 86 S.Ct. at 1328 n. 16 (being accessible to resolution by a reviewing court).

Nevertheless, the Rule superintending review of findings of fact is not wholly delimited by a functional perspective. For "[t]he same 'clearly erroneous' standard *applies to* findings based on documentary evidence as to those based entirely on oral testimony ... [even though] the presumption *has lesser force in* the former situation than in the latter." *Bose, supra,* 466 U.S. at 500, 104 S.Ct. at 1959 (emphasis supplied). Therefore, we know that "[t]he rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility." *Anderson, supra,* 470 U.S. at 574, 105 S.Ct. at 1512. Instead there are some essential analytical differences between the finding of facts and the expositing of law. The finding of fact is "[t]he trial judge's major role ... and with experience in fulfilling that role comes expertise" warranting appellate court deference, *id.* This analytical distinction between fact and law is what may be ultimately decisive in generating standards of review, for "[o]ne might therefore assume that the cases in which the appellate courts have a duty to exercise independent review are merely those in which the presumption that the trial court's ruling is correct is particularly weak, [*i.e.*, where it does not depend principally on credibility judgments]. The difference between the two rules, however, is much more than a matter of mere degree," *Bose, supra,* 466 U.S. at 500–01, 104 S.Ct. at 1959.

## C.

A determination of what issue of fact has previously been determined by a verdict of not guilty "requires a court 'to examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'" *Ashe v. Swenson,* 397 U.S. at 444, 90 S.Ct. at 1194 (quoting Mayers & Yarbrough, *Bis Vexari: New Trials and Successive Prosecutions,* 74 HARV.L.REV. 1, 38–39).

Analytically, this appears to 'us to be a pure question of law. The nature of the analysis required to determine a question of collateral estoppel—assuming rationality in the jury verdict, what issue of fact must the jury have resolved in the defendant's favor—with its focus on the pleadings, evidence and jury instructions is the type of analysis that generally constitutes a question of law. Put another way, this is the type of issue generally entrusted to appellate courts, "in light of conceptions about the nature and significance of that issue in our legal system", *supra,* at 63. Using the functional approach leads to the same results. The task mandated by *Ashe v. Swenson* involves no evaluation or weighing of testimony, no fact finding, no evaluation of credibility, no need for a "feeling of the case," no trial judge expertise, or any of those other things which cause us to give deference to the trial court. Thus, whether we use the analytical or functional

approach or both, we are compelled to the conclusion that the issue of collateral estoppel under *Ashe v. Swenson* as applied to a particular jury verdict is a question of law. Thus our review is *de novo.*

An examination of both federal and state cases shows that while not stating the measure of review utilized, the courts did, in fact, review the matter *de novo. See e.g., De La Rosa v. Lynaugh,* 817 F.2d 259 (5th Cir.1987); *Flittie v. Solem,* 775 F.2d 933, 941–42 (8th Cir.1985) (en banc), *cert. denied,* 475 U.S. 1025, 106 S.Ct. 1223, 89 L.Ed.2d 333 (1986); *United States v. Mulherin, Jr.,* 710 F.2d 731, 740–43 (11th Cir.), *cert. denied,* 464 U.S. 964, 104 S.Ct. 402, 78 L.Ed.2d 343 (1983); *United States v. Mespoulede,* 597 F.2d 329 (2d Cir.1979); *United States v. Gonzalez,* 548 F.2d 1185, 1191–92 (5th Cir.1977); *United States v. Tramunti,* 500 F.2d 1334, 1346–49 (2d Cir.), *cert. denied,* 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1974); *Green v. United States,* 138 U.S.App.D.C. 184, 426 F.2d 661 (1970); *Travers v. United States,* 118 U.S. App. D.C. 276, 335 F.2d 698 (1964); *Gareeb v. Weinstein,* 161 N.J.Super. 1, 390 A.2d 706 (1978); *Dixon v. State,* 513 So.2d 951 (Miss.1987); *Aetna Life Insurance Co. v. McElvain,* 717 P.2d 1081 (Mont.1986); *Simon v. Commonwealth,* 220 Va. 412, 258 S.E.2d 567 (1979); *Jones v. Commonwealth,* 217 Va. 231, 228 S.E.2d 127 (1976).

Finally, we note that the Supreme Court stated that collateral estoppel, as part of the Double Jeopardy Clause of the Fifth Amendment, is "a matter of constitutional fact *we* must decide through an examination of the entire record." *Ashe v. Swenson, supra,* 397 U.S. at 443, 90 S.Ct. at 1194 (emphasis added) (citing *New York Times v. Sullivan,* 376 U.S. 254, 271, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964); *Niemotko v. Maryland,* 340 U.S. 268, 271, 71 S.Ct. 325, 327, 95 L.Ed. 267 (1952); *Watts v. Indiana,* 338 U.S. 49, 51, 69 S.Ct. 1347, 1348, 93 L.Ed. 1801 (1949)); *Chambers v. Florida,* 309 U.S. 227, 229, 60 S.Ct. 472, 473, 84 L.Ed. 716 (1940); *Norris v. Alabama,* 294 U.S. 587, 590, 55 S.Ct. 579, 580, 79 L.Ed. 1074 (1935).

All the foregoing confirm us in our view that our review is *do novo.*

## V. Collateral Estoppel

### A.

Although collateral estoppel has been a portion of the Double Jeopardy Clause of the Fifth Amendment since at least the Supreme Court's decision in *United States v. Oppenheimer,* 242 U.S. 85, 37 S.Ct. 68, 61 L.Ed. 161 (1916), and was further explicated by the Court in *Sealfon v. United States,* 332 U.S. 575, 68 S.Ct. 237, 92 L.Ed. 180 (1948), the doctrine was given renewed vitality by the Court in *Ashe v. Swenson, supra.* In defining collateral estoppel, the Court said: " 'Collateral estoppel' is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.,* 397 U.S. at 443, 90 S.Ct. at 1194. Not only has the Court set forth the doctrine of collateral estoppel, it has instructed us as to the proper approach in its application: "The federal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." *Id.* at 444, 90 S.Ct. at 1194. After directing that the review must focus on the record of the prior proceeding for the purpose of determining whether a rational jury could have based its verdict on an issue other than the one the defendant seeks to foreclose by collateral estoppel, the Court said:

> The inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.' Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where a final judgment was based on a general verdict of acquittal.

*Id.* at 444, 90 S.Ct. at 1194 (quoting *Sealfon, supra,* 332 U.S. at 579, 68 S.Ct. at 240).

We have addressed the issue of collateral estoppel as a component of double jeopardy in three cases beginning with *United States v. Smith*, 337 A.2d 499 (D.C.1975), followed by *Copening v. United States*, 353 A.2d 305 (D.C.1976), and most recently in *Jackson v. United States*, 528 A.2d 1211 (D.C.1987). In *Smith*, we made clear that "[t]he fundamental requirement for application of the doctrine of collateral estoppel is the ability to conclude what the jury must necessarily have determined at the prior trial." *Smith, supra*, 337 A.2d at 501. In *Copening*, we stated that the "application of the collateral estoppel doctrine requires the concurrence in different proceedings of the three circumstances of (1) a common factual issue necessary to both adjudications, (2) a prior determination of that issue in litigation between the same parties, and (3) a showing that the determination was in favor of the party seeking to raise the estoppel bar. 353 A.2d at 309; *accord Jackson, supra*, 528 A.2d 1211.

■ The defendant has the burden of proving that the test enunciated by the Supreme Court in *Ashe* and as explicated by us has been met. *Copening*, 353 A.2d at 309; *accord United States v. Gugliaro*, 501 F.2d .68, 70 (2d Cir.1974). We have recognized that where the previous determination relied upon as constituting the bar is a general verdict (as is virtually always the case in a criminal trial by jury), the difficulty of resolving the question is compounded. *Copening, supra*, 353 A.2d at 309. Other courts have recognized this difficulty. *See e.g., United States v. Tramunti, supra*, 500 F.2d at 1346; *Jones v. Commonwealth, supra*, 217 Va. at 232–33, 228 S.E.2d at 128–29 (1976).

■ We have also recognized that when the prior trial involved a multi-count indictment, wherein the jury acquitted on one count general verdict, and hung on the other count(s), "one is *frequently* unable to discern, as required by the doctrine of collateral estoppel, what the jury *must* have determined factually." *Smith, supra*, 337 A.2d at 501 (first emphasis added; second emphasis in original). However, the fact that the original determination was in a multi-count indictment part of which remains unresolved by the jury, is no *per se* bar to application of collateral estoppel. *United States v. Mespoulede, supra*, 597 F.2d at 336–37. As Chief Judge Irving R. Kaufman points out for the court in *Mespoulede*:

[I]t may seem odd that such a [per se] rule is pressed upon us, especially since the burden of litigating an issue that the defendant thought had been laid to rest for all time is no lighter than in the first trial. And indeed, with virtual unanimity, the cases have applied collateral estoppel to bar the Government from relitigating a question of fact that was determined in defendant's favor by a partial verdict.

*Id.* at 336. Judge Kaufman cited cases from the Third and Ninth Circuits as well as the United States District Courts in the Eastern District of North Carolina and the Southern District of New York. *United States v. Pappas*, 445 F.2d 1194, 1199 (3d Cir.) (dictum), *cert. denied*, 404 U.S. 984, 92 S.Ct. 449, 30 L.Ed.2d 368 (1971); *Cosgrove v. United States*, 224 F.2d 146 (9th Cir. 1955); *United States v. Flowers*, 255 F.Supp. 485 (E.D.N.C.1966); *United States v. Perrone*, 161 F.Supp. 252, 258–59 (S.D.N.Y.1958) (dictum). More importantly, however, for our consideration, *see M.A.P. v. Ryan*, 285 A.2d 310 (D.C.1971) (We are bound by decisions of the United States Court of Appeals for the District of Columbia Circuit decided prior to February 1, 1971), Chief Judge Kaufman points to cases in the United States Court of Appeals for the District of Columbia Circuit. *Green v. United States*, 138 U.S.App.D.C. 184, 426 F.2d 661 (1970) (per curiam); *Travers v. United States, supra*. In *Green, supra*, the court applied the doctrine of collateral estoppel. At their first trial, the defendants were acquitted on one count (unauthorized use of a vehicle) of a multi-count indictment. The jury hung on the remaining counts; a mistrial was declared. At the retrial, over defendants' collateral estoppel objection, McFarlane was permitted to testify that he and the defendants had stolen the car which was the subject of the prior acquittal and used in a robbery.

The Court of Appeals reversed, holding that "[u]nder familiar principles relating to collateral estoppel, the admission of this evidence was error...." *Id.* 138 U.S.App. D.C. at 185, 426 F.2d at 662.

Cases subsequent to *Mespoulede* have considered the doctrine of collateral estoppel in the context of multi-count indictments. Indeed, the United States Court of Appeals for this Circuit has rejected an attempt by the United States, citing to and relying primarily upon its own reading of our decision in *United States v. Smith, supra,* to engraft a multi-count exception on to *Ashe v. Swenson.*

> In the present case, the parties addressed the question of collateral estoppel below in connection with the defendants' motion to dismiss count two in the second trial. The Government's brief glosses over the *Ashe v. Swenson* doctrine, attempting to distinguish this case as influenced by different considerations because Bowman was charged with more than one count, while Ashe was faced with successive one-count prosecutions. We reject this attempt to sweep aside *Ashe v. Swenson* and its progeny, and hold that the doctrine of collateral estoppel is controlling here.

*United States v. Bowman,* 197 U.S. App. D.C. 246, 251–52, 609 F.2d 12, 17–18 (1979) (footnote omitted). Other circuits, as well, have applied traditional *Ashe v. Swenson* doctrines to partial verdicts in multi-count indictments. *See, e.g., United States v. Garza,* 754 F.2d 1202 (5th Cir.1985); *United States v. Price,* 750 F.2d 363 (5th Cir.), *cert. denied,* 473 U.S. 904, 105 S.Ct. 3526, 87 L.Ed.2d 651 (1985); *United States v. Kimberlin,* 805 F.2d 210 (7th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987); *United States v. Castro,* 629 F.2d 456 (7th Cir.1980); *United States v. Gornto,* 792 F.2d 1028 (11th Cir. 1986); *United States v. Rogers,* 788 F.2d 1472 (11th Cir.1986).

In the final analysis, although the fact of a general verdict as well as the fact of a partial verdict in a multi-count indictment may make our task difficult, we must be mindful that *Ashe v. Swenson* requires us to examine the record, taking into account the pleadings, evidence, instructions, closing argument and the like and conclude whether a "rational jury" could have acquitted based on an issue other than the one the defendant seeks to bar from reconsideration. *Ashe v. Swenson, supra.* Likewise, we must not make the defendant's task even more formidable by straining to postulate "hypertechnical and unrealistic grounds on which the ... [jury could] conceivably have rested" its conclusions. *United States v. Jacobson,* 547 F.2d 21, 23 (2d Cir.1976), *cert. denied,* 430 U.S. 946, 97 S.Ct. 1581, 51 L.Ed.2d 793 (1977); *see also Ashe v. Swenson, supra,* 397 U.S. at 444, 90 S.Ct. at 1194. Finally, we must be mindful of Supreme Court teachings:

> If a later court is permitted to state that the jury may have disbelieved substantial and uncontradicted evidence of the prosecution on a point the defendant did not contest, the possible multiplicity of prosecutions is staggering.... In fact, such a restrictive definition of 'determined' amounts simply to a rejection of collateral estoppel, since it is impossible to imagine a statutory offense in which the government has to prove only one element or issue to sustain a conviction.

*Ashe v. Swenson, supra,* 397 U.S. at 444 n. 9, 90 S.Ct. at 1194 n. 9 (quoting Mayers & Yarbrough, *supra,* at 38. It is to this task we now turn.

### B.

■ The government's theory throughout the presentation of its evidence, both in its case in chief and in rebuttal, was that Felder had the pistol in his actual possession; that he shot Gantt with this pistol, thereby killing him; and that Felder did not have a license to carry the pistol in the District of Columbia. The government principally relied on the testimony of Bellinger and Penn to place the gun in Felder's hand and to establish that he shot Gantt. The government relied on official records to establish that Felder was not licensed to carry a pistol in the District of Columbia; it presented testimonial evidence that the pistol was operable. Felder *never* contested these latter two elements

of the offense or the issue of general intent. His *only* challenge was to the government's evidence that he possessed the pistol at any time, or used it to shoot Gant. As previously stated, his defense was that he was innocently present when he saw Bellinger "interlocked" struggling with Gantt and heard a shot fired.

Although the government contended in the trial court that the jury may have acquitted based on a doubt about whether Felder had a license or whether the pistol was operable, it correctly does not advance those arguments here. *See Ashe v. Swenson, supra,* 397 U.S. at 444 n. 9, 90 S.Ct. at 1194 n. 9. Rather, the government contends collateral estoppel does not apply for two reasons. The first is that the acquittal could have been the result of lenity. The second is that the jury may have concluded that while Felder possessed the pistol long enough to commit the "while armed" element of felony murder while armed and attempted robbery while armed, he did not possess the weapon long enough to commit the offense of "carrying" a pistol without a license. In our view, the government's arguments are nothing more than urging us to ignore the task mandated by *Ashe v. Swenson*— to determine from the record what the jury necessarily must have decided, approaching the jury verdict with realism and rationality while eschewing a hypertechnical and archaic approach.

The government's argument that the jury may have exercised lenity, while perhaps factually true in some cases, proves too much; thus it proves nothing. Any partial verdict could be rationalized on this basis. *See Green v. Estelle,* 601 F.2d 877, 878 (5th Cir.1979); *De La Rosa v. Lynaugh, supra.* For, in essence, the government's argument is based on the same fallacy which underlies the contention rejected by virtually all the courts which have considered the issue, including this court, that there is a per se multi-count exception to the doctrine.

The government's attempt to draw a distinction between "possess" and "carry", on the facts of this case, is similarly unavail-

ing. The government argues that the jury may have concluded factually that Myles brought the gun to the scene of the shooting; that Felder came into possession of it just before the shooting; that he shot and killed Gantt and then dropped the gun to the ground. The jury could have then factually determined that Myles picked up the gun and recovered it from the scene, says the government. Indeed, there is in the record evidence that would support such a factual finding, if made. That does not get the government "home free" however. What the government would have us conclude is that the jury, confused about the law, concluded that the time of possession necessary to shooting Gantt with the pistol is less than the time of possession necessary to convict of carrying a pistol without a license. We find no basis in the record suggesting such jury confusion on the law. As courts have repeatedly said, we presume juries follow instructions on the law. *Tennessee v. Street,* 471 U.S. 409, 415, 105 S.Ct. 2078, 2082, 85 L.Ed.2d 425 (1985); *Marshall v. Lonberger,* 459 U.S. 422, 438 n. 6, 103 S.Ct. 843, 853 n. 6, 74 L.Ed.2d 646 (1983); *Parker v. Randolph,* 442 U.S. 62, 73, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713 (1979) (plurality opinion); *Hairston v. United States,* 497 A.2d 1097, 1103 (D.C. 1985); *Sherrod v. United States,* 478 A.2d 644, 659 (D.C.1984); *see Frazier v. Cupp,* 394 U.S. 731, 735–36, 89 S.Ct. 1420, 1422–23, 22 L.Ed.2d 684 (1969).

Here, the jury was instructed that "[a] pistol is carried openly or concealed on or about the defendant's person if it is actually on his person or if it is located in such proximity to him as to be convenient of access and within reach." As we have previously stated, the government argued to the jury that this momentary possession was sufficient to support a conviction of carrying a pistol without a license. This argument was entirely correct and fully consistent with the instruction just previously quoted. The record does not suggest that the jury failed to follow the instructions. We decline the government's invitation to engage in speculation that the jury

misunderstood or ignored the law.[8]

## VI.   Conclusion

"The single rationally conceivable issue in dispute before the jury was whether [Felder possessed (carried) the pistol at the relevant time]. And the jury by its verdict found he had not." *Ashe v. Swenson, supra,* 397 U.S. at 445, 90 S.Ct. at 1195. The collateral estoppel component of the Double Jeopardy Clause prevents the government from relitigating these facts.

Felder, through counsel, in urging us to use a deferential measure of review referred to Judge Walton as an experienced trial judge. Indeed, Judge Walton's experience in the criminal law is broad, deep, and often insightful. We think the best tribute we can give to Judge Walton, is to hold, as we do, after our *de novo* review of the question, that his ruling was eminently correct.

AFFIRMED.

GALLAGHER, Senior Judge, dissenting:

If in this case Felder had been acquitted, as he was on the weapon possession charge and, also, had been convicted of the shooting and armed robbery, we would think nothing of the obvious inconsistency, because this is commonplace in trials with multiple count indictments. We would ignore it even though it meant that the jury would have decided that the defendant shot (or robbed) the victim with a gun the jury found he did not have. Inconsistent verdicts like that occur frequently where there are multiple counts, as we know so well.

Here, instead of acquitting on the remaining basic felony charges, the jury hung. One would logically expect that, to be consistent, it would have acquitted, as one could hardly shoot or commit the armed robbery without the gun.

While the majority opinion has a theoretical appeal, we know it to be a fact of life in the administration of the criminal justice system—where multiple count indictments are involved—that to follow this course would be to ignore the well-recognized realities of the trial court. Since the jury hung on some counts of the multiple count indictment, I think the government should not be barred from a retrial of these counts. *United States v. Smith,* 337 A.2d 499 (D.C.1975).

Needless to say, if the first trial in this case had involved only one count, this being the weapon charge on which he was acquitted, the result, for me, would be different and I would favor application here of the collateral estoppel doctrine in relation to a subsequent trial on the presently charged offenses, which would necessitate possession of the weapon.

---

**8.** We note that there is nothing in the law of collateral estoppel as embodied in the Double Jeopardy Clause which requires or even suggests that a court must be able to find consistency where a jury has acquitted on one count and hung on another. In this case, however, *we note in passing* that such consistency can be found. The testimony of Phillips, the government's ballistics expert, was that the shot that killed Gantt was a contact shot. This testimony contrasted with that of Bellinger and Penn (the government's two eyewitnesses), who placed the gun at various distances away from the victim, all inconsistent with a contact shot. However, the ballistics evidence was consistent with Felder's testimony painting a picture of Bellinger "interlocked" and struggling with Gantt when Gantt was shot. All jurors well could have had a reasonable doubt on whether Felder was the triggerman while one or more jurors were satisfied that he was an aider and abettor in an attempted robbery while armed which led to Gantt's death. In other words, what may have occurred is that one or more of the jurors may have been persuaded by the government's alternative argument that Felder was an aider and abettor in the felony murder while all concluded he never possessed (carried) the pistol.