**Pedro A. JOYA, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 12–CO–252.**

District of Columbia Court of Appeals.

Argued June 26, 2012.

Decided Sept. 20, 2012.

---

9. *Id.* (citations omitted).

10. *Id.* (quotation omitted).

11. *Id.* (citation omitted).

12. D.C.Code § 22–4504(a)(1) (2001); *McCullough v. United States,* 827 A.2d 48, 58 (D.C. 2003).

13. D.C.Code § 7–2502.01 (2001).

14. D.C.Code § 22–4503(a)(2) (2001).

Jonathan W. Anderson, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the brief, for appellant.

Elizabeth H. Danello, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, Roy W. McLeese III, Assistant United States Attorney at the time the brief was filed, and Trevor McFadden and Mervin A. Bourne, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON and OBERLY, Associate Judges, and TERRY, Senior Judge.

THOMPSON, Associate Judge:

This matter is an interlocutory appeal from the trial court's denial of a motion by appellant Pedro Joya to dismiss a charge of contributing to the delinquency of a minor (CDM), on which appellant is awaiting trial. Appellant contends that the government is barred by collateral estoppel, as embodied in the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, from prosecuting him on that charge, which arose in connection with robbery, assault, and

weapons offenses of which appellant was acquitted in an earlier trial. The government contends that appellant waived the issues of double jeopardy and collateral estoppel when he successfully sought severance of the CDM charge from the charges on which he was tried earlier. Although we conclude that appellant did not waive the shield of collateral estoppel, we affirm the trial court's denial of the motion to dismiss.

## I.

The background of this appeal is as follows. A September 21, 2011, indictment charged appellant with armed robbery,[1] assault with significant bodily injury,[2] carrying a dangerous weapon (CDW),[3] possession of a prohibited weapon (PPW),[4] and CDM.[5] Four other men—Kelvin Parada, Edvin Ramirez, Lester Flores, and Pablo Joya (appellant's brother)—were also variously charged in the fifteen-count indictment with some or all of those and other offenses. All of the charges were in connection with a robbery that occurred on May 31, 2011, and all five men were scheduled to be tried together. As described in more detail below, the robbery victim reported that after the robbery, his assailants made "gang signs." The grounds for the CDM charge are that (1) Parada was a minor on the date of the charged offenses, and (2) according to the government's theory, appellant, Ramirez, and Pablo Joya "invite[d], solicit[ed], recruit[ed], assist[ed], support[ed], cause[d], encourage[d], enable[d], induce[d], advise[d], incite[d], facilitate[d], permit[ted], or allow[ed]"[6] Parada's involvement in a gang-related felony

(robbery), as part of Parada's induction into gang membership.

As the parties were preparing for a joint trial of the group of defendants on all of the charges, the government filed a motion seeking leave to present expert testimony regarding the practices of the gang known as Mara Salvatrucha, or "MS–13" (according to the government, the gang to which the defendants belonged or with which they associated). There followed appellant's opposition to the government's motion to permit the introduction of gang evidence and defendants' written or oral motions for severance. At a hearing before the court on November 14, 2011, appellant's trial counsel argued that, as to the CDM charge, joinder would mean that he would "have no way of confronting the [government's gang] expert on what Kelvin Parada's state of mind is other than to use [co-defendant] Kelvin Parada, who's unavailable" (because, presumably, Parada would not testify).

After hearing from counsel at length, the trial court ruled from the bench that the gang evidence was "highly inflammatory" and would not be admissible in the government's case-in-chief as to the robbery, assault, weapons possession, and other non-CDM charges, because its probative value was far outweighed by the risk of unfair prejudice. The court reasoned, however, that the gang evidence would be of "some probative value" if Ramirez, Pablo Joya, and appellant were tried separately on the CDM charge.[7] The court also acknowledged appellant's argument "that it really puts the defendants in . . . a

---

1. *See* D.C.Code §§ 22–2801, 4502 (2001).

2. *See* D.C.Code § 22–404(a)(2) (2001).

3. *See* D.C.Code § 22–4504(a) (2001).

4. *See* D.C.Code § 22–4514(b) (2001).

5. *See* D.C.Code § 22–811(a)(7) (2001).

6. D.C.Code § 22–811(a).

7. Neither Flores nor Parada (the alleged target of CDM) was charged with CDM.

... situation where the defendant is both on trial as a co-defendant and the alleged victim of Mr. Ramirez, Mr. Joya and Mr. Joya, and what is on that person's mind, what his actual role was, what he believed was happening ... becomes unavailable to them as testimony or evidence that they could use[,] because of his status as a co-defendant." The court therefore concluded that "for a couple of reasons," there was "a good basis to sever" the CDM counts from the other counts.

Thereafter, trial (the "first trial") proceeded on the non-CDM charges. The government presented evidence that on May 31, 2011, complainant Maximiliano Garcia–Lopez was robbed at knife point. Garcia–Lopez testified that at around 10:30 p.m., he was walking down 16th St., N.W., when Pablo Joya confronted him and demanded money.[8] When Garcia–Lopez said that he did not have any money, Pablo Joya went behind him and stood about six or seven feet away. Ramirez and Parada then approached Garcia–Lopez. Appellant, who joined the men and also stood about six to seven feet behind Garcia–Lopez, was looking from "side to side."

Ramirez then demanded money from Garcia–Lopez. Garcia–Lopez attempted to run away, but Ramirez caught up with him and held a knife to Garcia–Lopez's throat. Parada then took Garcia–Lopez by the arm and guided him to a nearby park, while Ramirez held the knife to Garcia–Lopez's back. In the park, Ramirez pushed Garcia–Lopez to the ground, with the knife to his back, while Parada took his wallet and bag. Garcia–Lopez testified that, meanwhile, he could see appellant watching him. He testified that he thought appellant was "the eyes" and was "watching out[.]"

After threatening that they would kill Garcia–Lopez if he reported the incident to the police, Ramirez and Parada ran off. Garcia–Lopez testified that as they ran away, they were making "motions with [their] hands" that looked like gang signs. Two days after the robbery, Garcia–Lopez spotted five men—appellant, Pablo Joya, Ramirez, Parada, and Flores—sitting together near the location where the robbery had occurred. Garcia–Lopez notified the police, who found, under the staircase where the men had been sitting, a knife that Garcia–Lopez identified as the one used in the robbery.

The government's theory, which it argued to the jury, was that appellant aided and abetted the robbery. Specifically, in opening argument, the prosecutor told the jury that appellant and Flores came over to Garcia–Lopez and stood behind him, joining the other men in surrounding him and "blocking the way he just came." In closing argument, the prosecutor argued that appellant and Flores "t[ook] up their positions behind Mr. Garcia" and had "an integral role in the robbery," in that they stood on the corner of 16th and Lamont Streets as "lookouts" and "performed the acts of blocking off, surrounding, intimidating, [and] scaring Mr. Garcia, and then looking out for the police to make sure that no one could stop this robbery[.]" In rebuttal, the prosecutor argued that appellant and the other lookouts were "standing about 7 feet behind him," "facing toward the street with their backs to him looking back and forth, up and down 16th Street," "blocking [Garcia–Lopez's] escape and ... watching for cops" or "for anybody who might be able to help" and "looking back to make sure that the robbery is going according to plan."

---

8. At the time of the robbery, Garcia–Lopez did not know any of the defendants by name, but later pointed each man out to police officers and described what each man did.

Before sending the jurors to deliberate, the court gave them an aiding and abetting instruction.[9] On December 2, 2011, the jury delivered its verdict, acquitting appellant of all charges.[10]

The government then proceeded with the CDM charge against Ramirez, Pablo Joya, and appellant and with the (to-be-retried) robbery charge against Pablo Joya, with the trial court denying Pablo Joya's motion for severance of the robbery charge. As specified in the indictment, the CDM charge against appellant and his co-defendants is that "[o]n or about May 31, 2011, within the District of Columbia, . . . being four years or more older than Kelvin Parada, a minor, [the defendants] invited, solicited, recruited, assisted, supported, caused, encouraged, enabled, induced, advised, incited, facilitated, permitted, and allowed Kelvin Parada to [commit a felony, robbery]." Appellant moved to dismiss the charge, asserting that, in acquitting appellant, the jury in the first trial had rejected the government's evidence that appellant participated in the robbery of Garcia–Lopez. Appellant argued that any "presentation of evidence, witness testimo-

ny, or arguments" that appellant had done so "would violate [appellant's] constitutional right not to be placed in jeopardy twice for the same offense," since "the Double Jeopardy Clause [of the Fifth Amendment to the Constitution] precludes the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial" (quoting *Yeager v. United States,* 557 U.S. 110, 119, 129 S.Ct. 2360, 174 L.Ed.2d 78 (2009)). Appellant asked the court to rule that the government therefore is precluded from presenting any evidence or arguments that appellant participated in the robbery.

The trial court denied the motion to dismiss, reasoning that the issue in the CDM case is whether appellant "recruited, encouraged and induced Mr. Parada to commit the robbery," and stating, "I don't believe we could fairly say that this issue has already been decided by the first trial[.]"[11] The court noted with approval that the government "will be presenting evidence of the robbery incident as they must . . . in order to explain the background of the [CDM] charge[.]" The court cautioned, however, that the government

9. Specifically, the court told the jury that "[a]ny person who in some way intentionally participates in the commission of a crime can be found guilty either as an aider and abettor or as a principal offender . . . [and] is guilty of the crime as he would be if he had personally committed each of the acts that make up the crime. To find that the Defendant aided and abetted in committing a crime, you must first find that the Defendant knowingly associated himself with the commission of the crime, that he participated in the crime as something he wished to bring about and that he intended by his actions to make it succeed. Some affirmative conduct by the Defendant in planning or carrying out the crime is necessary. Mere physical presence by the Defendant at the place and time of the crime is committed is not by itself sufficient to establish guilt."

10. The other verdicts were various: *inter alia,* the jury convicted Ramirez and Parada of

armed robbery, acquitted Pablo Joya of armed robbery but could not reach a verdict on the lesser-included charge of robbery, and acquitted Flores of all charges.

11. The court explained,

I believe that in terms of the legal theory a Defendant could have committed the crime of contributing to the delinquency of a minor without also committing the offense of aiding and abetting the robbery and the first jury could have concluded that he couldn't be found to have aided and abetted the robbery because he was simply too far away or too physically distant and the proof was not fulsome as to his involvement in planning or encouraging or assisting[;] he still, in the Court's view, could have been responsible for inducing Mr. Parada to or contributing to the delinquency of a minor as to the elements of that charge.

"should stop short of focusing in its argument on statements that [appellant] committed the robbery ... [or] aided and abetted in the robbery," because appellant "would have a compelling argument as to [preclusion of] those statements[.]"[12] "Obviously," the trial judge acknowledged, the court "will have to construct a clear instruction to the jury about what is before them and what is not before them," and "there needs to be a great deal of care taken with the actual language[.]" The court also cautioned the prosecutor that it "would likely sustain an objection by [appellant's counsel] if the Government were to develop evidence about what [appellant] did other than as it directly relates to the contributing, inciting or inducing."

█ This interlocutory appeal followed. Appellant's brief summarizes the issue presented as follows: "Does the collateral estoppel doctrine as embodied in the Double Jeopardy Clause preclude the government from prosecuting [appellant] on the charge of contributing to the delinquency of a minor (CDM), where the government has represented that it will prove the CDM charge by proving that [appellant] assisted Kelvin Parada to commit a robbery and [appellant] has already been acquitted of participating in the robbery as an aider and abettor?" Our review of this question—to which we give a mixed answer—is de novo. *United States v. Felder,* 548 A.2d 57, 64–65 (D.C.1988).

## II.

█ The Double Jeopardy Clause of the Fifth Amendment "embodies two vitally important interests." *Yeager,* 557 U.S. at 117, 129 S.Ct. 2360. "The first interest protected by the Clause is captured in what we refer to as the 'traditional principles of double jeopardy,' " *United States v. Howe,* 590 F.3d 552, 555 (8th Cir.2009), i.e., the principle that "the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *Yeager,* 557 U.S. at 117–18, 129 S.Ct. 2360 (quoting *Green v. United States,* 355 U.S. 184, 187–88, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957) (internal quotation marks omitted)). This first interest protects against "prosecutorial overreaching" through successive prosecutions. *Ohio v. Johnson,* 467 U.S. 493, 501, 104 S.Ct. 2536, 81 L.Ed.2d 425 (1984).

█ The second interest embodied by the Double Jeopardy Clause is "preservation of the finality of judgments." *Yeager,* 557 U.S. at 118, 129 S.Ct. 2360 (internal quotation marks omitted). That is, the Double Jeopardy Clause forecloses "relitigati[on] [of] any issue that was necessarily decided by a jury's acquittal in a prior trial." *Id.* at 119, 129 S.Ct. 2360. Stated differently, it dictates that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties[.]" *Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) (explaining that this is the principle of

---

12. This cautionary comment was in response to the prosecutor's statement that the government is "going to be arguing that he assisted, encouraged and [did] all of these other things [to assist] Kevin Parada in robbing the victim and that part of the way he did that was by these actions that the victim described; that these would all be actions that would go towards assisting Kevin Parada in carrying out the robbery that he committed[.]" The prosecutor's reference to "all of these other things" was a reference to the list of verbs used in the definition of CDM. *See* D.C.Code § 22–811(a).

"collateral estoppel"); *see also United States v. McMillian*, 898 A.2d 922, 933 (D.C.2006) ("[T]he 'established rule of collateral estoppel in criminal cases is embodied in the Fifth Amendment guarantee against double jeopardy.'") (quoting *Ashe*, 397 U.S. at 445, 90 S.Ct. 1189).[13]

█ "[I]n any criminal proceeding where collateral estoppel is asserted, the burden is on the 'defendant to demonstrate that the issue whose relitigation he seeks to foreclose was actually decided in the first proceeding.'" *Halicki v. United States*, 614 A.2d 499, 502 (D.C.1992) (quoting *Dowling v. United States*, 493 U.S. 342, 350, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)). "Unless the record of the prior proceeding affirmatively demonstrated that an issue involved in the second trial was *definitely determined* in the former trial, the possibility that it may have been does not prevent relitigation of that issue." *Id.* (quoting *United States v. Smith*, 337 A.2d 499, 503 (D.C.1975)).

### III.

The government—before addressing whether the jury in the first trial already resolved the issues that a jury would be asked to resolve in the CDM trial—argues that even if collateral estoppel would otherwise preclude the government from proceeding with the CDM prosecution, appellant has waived any collateral-estoppel

claim. The government invokes the principle, derived from *Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), that where a defendant has successfully sought severance (here, of the CDM count), he may not claim Double Jeopardy Clause protection against a second trial on the severed charge.[14]

We conclude that *Jeffers* does not fully answer the question presented here because, unlike this case, it turned on application of the first interest embodied in the Double Jeopardy Clause—the "traditional" double jeopardy protection against successive prosecutions. That traditional protection means that the government may not place a defendant in jeopardy multiple times for the same conduct and thus, for example, may not "try[ ] a defendant for a greater offense after it has convicted him of a lesser included offense." *Id.* at 150, 97 S.Ct. 2207. A plurality of the Supreme Court held in *Jeffers*, however, that where the defendant obtained severance of a "continuing criminal enterprise" charge and a lesser-included charge of drug conspiracy, and where he was thereafter convicted of the lesser charge, he could not claim double-jeopardy protection against a subsequent trial on the greater charge. *Id.* at 152, 97 S.Ct. 2207. *Jeffers* thus established that a successful motion for severance creates an exception to traditional double jeopardy protection: "there is no violation of the Double Jeopardy

---

**13.** To facilitate discussion, we will refer to the first interest embodied by the Double Jeopardy Clause as "double jeopardy" and the second interest as "collateral estoppel."

**14.** Appellant argues that his severance motion has no bearing on this case because "[t]he severance of counts was the judge's way of effectuating [its] ruling" that the government's proffered gang evidence would be inadmissible as to the robbery and other non-CDM counts, and because appellant's "articulated bases for severance of counts were unsuccessful." We reject this argument. The

trial court, although primarily relying on the prejudicial effect of the gang evidence, repeatedly cited "a couple of reasons" that provided a "good basis to sever." Those reasons included appellant's argument that without severance, he would not be able to confront Parada about his state of mind, which the court agreed was relevant to the CDM count; the court stated that it would be "unfair to the defense to proceed to trial on the CDM charge" with Parada being "unavailable if he was on trial with the other four defendants."

Clause when [a defendant] elects to have the two offenses tried separately and persuades the trial court to honor his election." *Id.* at 152, 97 S.Ct. 2207.

By contrast, the issue we are asked to resolve in this case involves the *second* interest protected by the Double Jeopardy Clause: protection against re-litigation of issues already decided.[15] The government rejects that distinction, contending that the exception established by *Jeffers*—a waiver of Double Jeopardy Clause protection where successive prosecutions have been occasioned at the defendant's behest—applies to collateral-estoppel protection just as it does to the "traditional" double jeopardy protection against successive prosecutions.[16] For this argument, the government relies heavily on a statement contained in a footnote in *Johnson,* 467 U.S. 493, 104 S.Ct. 2536, 81 L.Ed.2d 425, which we quote below.

In *Johnson,* the defendant was charged with murder, involuntary manslaughter, aggravated robbery, and grand theft. He pled guilty to involuntary manslaughter and grand theft. The trial court then dismissed the murder and robbery charges on the theory that prosecuting Johnson for those remaining charges would subject him to double jeopardy. The Supreme Court reversed, reasoning that Johnson had "not been exposed to conviction on the charges to which he pleaded not guilty," that the State had not had "the opportunity to marshal its evidence and resources more than once or to hone its presentation

of its case through a trial," and that there "simply [had] been none of the governmental overreaching that double jeopardy is supposed to prevent." *Id.* at 501–02, 104 S.Ct. 2536. In the footnote in question, the Court also addressed the argument that prosecution on the remaining charges was barred by collateral estoppel. The Court reasoned:

> Respondent also argues that prosecution on the remaining charges is barred by the principles of collateral estoppel enunciated by this Court in *Ashe v. Swenson,* 397 U.S. 436 [90 S.Ct. 1189, 25 L.Ed.2d 469] (1970). Even if the two [i.e., involuntary manslaughter and murder] were mutually exclusive crimes, ... the taking of a guilty plea is not the same as an adjudication on the merits after full trial.... *Moreover, in a case such as this, where the State has made no effort to prosecute the charges seriatim, the considerations of double jeopardy protection implicit in the application of collateral estoppel are inapplicable.*

467 U.S. at 500 n. 9, 104 S.Ct. 2536 (emphasis added, footnote reference omitted). The government suggests that the language we have italicized supports the proposition that collateral estoppel may not be invoked where the government cannot be said to have overreached by initiating successive prosecutions.

We do not think the dictum in *Johnson* can fairly be read to mean that it can never be appropriate to apply collateral estoppel where the government has not

---

**15.** As appellant emphasizes, this case also involves a second prosecution after an *acquittal,* whereas *Jeffers* involved prosecution for a greater offense after a *conviction* of the lesser offense.

**16.** We recognize that the government states in its brief that it is the *"combination* of appellant's severance motion and the exclusion from the first trial of evidence that is relevant to the severed count [that] precludes appel-

lant's collateral-estoppel claim[ ]" (emphasis added), and asserts that this court need not "consider the validity of a flat rule that a defendant who seeks severance is barred from later raising a collateral estoppel claim." However, at oral argument, the government appeared to be urging just such a flat rule, which, it argued, follows from language in *Johnson,* discussed in the text *infra.*

sought to initiate successive prosecutions.[17] Indeed, we think *Yeager* forecloses such a reading. In *Yeager*, defendant was charged with multiple offenses, and the jury acquitted on some of the charges, and was hung on others. 557 U.S. at 114–15, 129 S.Ct. 2360. The Supreme Court held that the acquittals and collateral estoppel barred the government from re-trying Yeager on the charges on which the jury hung, reasoning that since "the possession of insider information was a critical issue of ultimate fact in all of the charges against petitioner, a jury verdict that necessarily decided that issue in his favor protects him from prosecution for any charge for which that is an essential element." *Id.* at 122–23, 129 S.Ct. 2360. The *Yeager* majority thus implicitly rejected the view of the dissenting Justices that collateral estoppel is inapplicable "where the State has made no effort to prosecute the charges seriatim[.]" *Id.* at 131, 129 S.Ct. 2360 (Scalia, J., dissenting).[18] As one court recognized even prior to *Yeager*, "the

dictum in *Ohio v. Johnson* is unavailing" where a defendant invokes estoppel "as a shield to prevent the government from having an opportunity to relitigate issues which were already decided in the first trial." *United States v. Bailin*, 977 F.2d 270, 278–79 (7th Cir.1992); *see also id.* at 275 (rejecting the government's argument that "collateral estoppel can never apply in circumstances where double jeopardy does not").[19]

■ Neither *Jeffers*, nor *Yeager*, nor this court's case law squarely answers the question presented here: whether collateral-estoppel protection is waived where, *through a successful motion for severance*, a defendant has waived traditional double-jeopardy protection against a successive prosecution for the same conduct. Courts have not been uniform in their rulings about whether collateral estoppel can bar a prosecution even if (because of a waiver) the "traditional" protection against double

17. We think the dictum in *Johnson* italicized above may mean no more than this: that in a case involving guilty pleas on some but not all joined charges, where the government is left to pursue the remaining charges separately— parenthetically, a case in which it cannot be said that the government has attempted successive prosecutions—there is no occasion for application of collateral estoppel, because nothing has yet been adjudicated by a finder of fact.

18. This court's ruling in *Felder* was to similar effect. *See* 548 A.2d at 69 (holding that "[t]he collateral estoppel component of the Double Jeopardy Clause prevent[ed] the government from relitigating [certain] facts" after a jury acquitted Felder of a weapons offense but hung on murder and robbery charges).

19. In resisting appellant's invocation of collateral estoppel, the government also relies on the following dictum from this court's opinion in *In re A. L. S.*, 377 A.2d 1149 (D.C.1977): "[A]ppellant has no basis to raise any plea in bar (double jeopardy—res judicata or collater-

al estoppel) since separate trials resulted from his own efforts to that end." *Id.* at 1151. That reliance is misplaced, since *A. L. S.* did not involve relitigation of an issue decided in a previous trial. Defendant A.L.S. was tried for felony murder and the predicate armed robbery, and was tried separately for two other armed robberies, as a result of a successful motion for severance. This court commented that there had been "a dubious basis for the order of a separate trial of the murder case," but observed that the error had been "rectified when the trial judge in the murder case, who had not ordered the separate trial, permitted the introduction of the ... evidence" of the other robberies. *Id.* That was the background of the remark that A.L.S. had no basis to complain about evidence that would have been admissible if, as seemed appropriate, the cases had remained joined. There is no suggestion in the opinion (and we discern no basis for inferring) that the judge who rendered the verdict on the two robberies necessarily decided (or even arguably decided) any issue raised in the felony murder/robbery case, or vice versa.

jeopardy does not,[20] but we think the better reasoning is that it can, and that a defendant's waiver of double-jeopardy protection through a successful motion for severance does not amount to a waiver of the principle that the government may not re-litigate an issue resolved in a prior trial (or in a simultaneous trial).[21] We agree with the Supreme Court of Iowa that "[t]o hold otherwise would violate our notions of fundamental fairness[.]" *State v. Butler,* 505 N.W.2d 806, 810 (Iowa 1993) (holding that although the defendant "certainly waived his right to protest a second prosecution under double jeopardy, we find no reason to conclude collateral estoppel is likewise waived").

■ We conclude that appellant is entitled to protection from re-litigation of any issues that the jury decided in the first trial. We must next consider whether this means—as appellant argues—that the CDM prosecution may not go forward. The question is whether the jury's "not guilty" verdicts necessarily resolved in appellant's favor any issue of fact that must be proven to convict him of the charged offense of CDM.

## IV.

■ "A determination of what issue of fact has previously been determined by a verdict of not guilty requires a court to examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." *Felder,* 548 A.2d at 64 (quoting *Ashe,* 397 U.S. at 444, 90 S.Ct. 1189) (further citations and internal quotation marks omitted). "A re-

**20.** *Compare United States v. Aguilar–Aranceta,* 957 F.2d 18, 22–23 (1st Cir.1992) (concluding that the defendant had waived any double jeopardy claim through her consent to a mistrial, but going on to consider whether acquittal on one charge had a collateral estoppel effect on the retrial of the mistried charge), *with United States v. Blyden,* 964 F.2d 1375, 1379 (3d Cir.1992) (agreeing that "where the defendants' choice and not government oppression caused the successive prosecutions, the defendants may not assert collateral estoppel as a bar against the government any more than they may plead double jeopardy") (citation and internal quotation marks omitted), *and State v. Chenique–Puey,* 145 N.J. 334, 678 A.2d 694, 698–99 (1996) ("A defendant who moves to sever the trial of a charge of contempt of a domestic violence restraining order from the trial of an underlying offense should be precluded from then asserting double jeopardy or collateral estoppel bars to the subsequent prosecution.").

**21.** The decision of the Supreme Court of Pennsylvania in *Commonwealth v. States,* 595 Pa. 453, 938 A.2d 1016 (2007), illustrates the point. There, defendant States and two other men were in an automobile accident; States survived the crash, but the two other men died. The Commonwealth charged States with involuntary manslaughter, homicide by vehicle, homicide by vehicle while driving under the influence of alcohol, and driving under the influence, and also with an offense known as "Accidents Involving Death or Personal Injury While Not Properly Licensed." States successfully sought severance of the "Accidents Involving Death" charge. The parties agreed to a simultaneous jury/bench trial, with the court determining guilt on the Accidents Involving Death charge, and the jury considering all of the other charges. The jury eventually told the trial court that it was hopelessly deadlocked on the charges before it, and the trial court declared a mistrial. However, as to the "Accidents Involving Death" charge, the court acquitted States. States then filed a motion to dismiss the remaining charges, arguing that the trial court's finding that the Commonwealth had failed to prove that he was the driver foreclosed further litigation on that issue. The Supreme Court of Pennsylvania agreed, and held that the Commonwealth could not retry States on the charges upon which the jury could not agree, because "to do so would permit relitigation of an issue already determined, by final judgment, in States' favor." *Id.* at 1027.

view of the evidence presented at trial as well as the positions urged by the United States during trial is necessary to our *Ashe v. Swenson* analysis." *Id.* at 58.

In this case, the prosecutor told the trial court that the government will argue in the CDM trial that appellant assisted, encouraged "and [did] all of these other things [to assist] Kevin Parada in robbing the victim[.]" As already noted in footnote 12, the phrase "all of these other things" was a reference to the string of verbs used in the CDM statute, which states in relevant part:

> It is unlawful for an adult, being 4 or more years older than a minor, to invite, solicit, recruit, assist, support, cause, encourage, enable, induce, advise, incite, facilitate, permit, or allow the minor to: ... violate any criminal law of the District of Columbia for which the penalty constitutes a felony, or any criminal law of the United States, or the criminal law of any other jurisdiction that involves conduct that would constitute a felony if committed in the District of Columbia, except for acts of civil disobedience.

D.C.Code § 22–811(a). The government also told the court that it expects to prove its case through the testimony of Garcia–Lopez and the testimony of its gang expert, Immigration and Customs Enforcement Special Agent Robert Nieves, and that it does not expect to have "testimony from [Parada,] the targeted minor," although that could "change." As the government stated in opposing appellant's motion for a bill of particulars,[22] it expects that Nieves will testify about initiation into MS–13, which entails requiring a prospective gang member to carry out a "mission," "usually a robbery or other violent crime," to demonstrate that the prospect is "worthy to be inducted into the gang." Nieves is expected to testify that established MS–13 members "may take active roles as well ... or they may watch and evaluate" the prospective member's actions. They may "stand ready to jump in and assist in the crime if it appears that the [prospective member] may get hurt or if the target appears to be getting the upper hand." Nieves will testify that "[a]fter a successful mission, [prospective members] are ready for initiation into the gang."[23]

---

**22.** The trial court denied the motion, finding that appellant is "uniquely aware of the theory under which the Government is proceeding" and stating that it was "always expected that [the government] would be proceeding by establishing that a robbery occurred [and] establishing that the defendants who are charged with contributing to the delinquency of a minor encouraged him and incited him to perform this on the basis of the Government's theory that it has to do with gang initiation."

**23.** On November 10, 2011, Nieves testified during a hearing on the motion to exclude gang evidence from the robbery trial. His testimony included, *inter alia*, the following: [P]rospective gang members will be instructed to go out and commit that crime under the watchful eye of the more veteran or the older active gang members, to see if that person, that prospective gang member has the heart to commit those crimes in furtherance of the gang.

... [O]ther individuals will either participate, depending on what type of crime they'll be committing; if it's going to be a one-on-one or a two-on-two robbery or assault, then that prospective member would go out there and do that crime himself. And that person can be prompted by the more senior active member of MS 13 or they can just take it upon their own to go out and commit that crime while the other people are watching. If they did that under the eye, the watchful eye of the MS 13 gang member who is basically sponsoring them to be a member of the gang, that older gang member would tell them what they needed to do, and they would expect that prospective would go out and do that.

... [T]he gang knows that juveniles that commit crimes are dealt with a lot less ha[r]sher than adults are, and they recruit prospective members who are juveniles and ask them to go out and commit these crimes, because they know once they are

 Appellant argues that (1) any conduct that the government may seek to prove constituted CDM would necessarily also have constituted aiding and abetting the armed robbery; and (2) since the jury acquitted appellant of aiding and abetting the robbery, it necessarily found that he did not commit any of the acts that the government now alleges constitute CDM. We think this argument goes too far. We agree with appellant that the jury's guilty verdict means that the jury rejected the government's argument that appellant aided and abetted the robbery *by doing one or more of the things that Garcia–Lopez described*. Thus, the acquittal requires us to assume that the jury found that appellant did not participate in the robbery by blocking Garcia–Lopez's way and cutting off his escape route; or by "watching out"[24] or acting as a lookout for police or others who might stop the robbery; or by intimidating or scaring Garcia–Lopez.[25] Accordingly, we agree with appellant that the government is estopped from seeking to prove and from arguing that appellant assisted in the robbery in any of these ways and that he committed CDM by so doing.

 However, with appellant having successfully sought severance and having thereby waived his protection against double jeopardy, the government is not precluded from attempting to prove that appellant committed CDM by engaging in *other* conduct that is covered by the CDM statute and that is related to the May 31, 2011, robbery, even if that conduct constituted participating in, assisting, or aiding and abetting the robbery.[26] We reach this conclusion because we cannot say that the jury in the first trial "necessarily deter-

caught, the punishment for them will be less severe.

. . .

[W]hen you are dealing with prospective members, those members are the ones who are going to be going out there and committing the crime, whether it's at the direction of the older active MS 13 gang member or it's because the prospective recruit wants to show the older gang members, hey, I'm going to take some initiative here and just go out and rob this guy, that could be part of it.

Nieves also testified that he had information that appellant and Pablo Joya were members of MS–13.

**24.** Garcia–Lopez testified that appellant was "watching out" because he "was watching to both sides" during the robbery.

**25.** Stated differently, on the assumption that the jury followed the court's instructions, we must assume that if the jury had found that appellant did any of the things enumerated above, it would have convicted him of aiding and abetting the robbery. The government argues that the jury may have believed that appellant was acting as a lookout, but acquitted him because they erroneously believed that they were also required to find that he actually participated directly in taking the victim's property. We find this argument unpersuasive. The trial judge clearly instructed the jury that it need not find that appellant "personally committed each of the acts that make up the crime." "[W]e must presume that a jury follows the court's instructions, absent any indication to the contrary." *Daniels v. United States*, 2 A.3d 250, 264 (D.C.2010) (quoting *Lewis v. United States*, 930 A.2d 1003, 1008 (D.C.2007) (internal quotation marks omitted)).

The government also argues unpersuasively that the jury may have believed that appellant stood watch, ready to intervene, but did not do so because the principals did not need assistance. However, under the court's instructions, that would still have constituted "knowingly associat[ing] himself with the commission of the crime"—meaning that we must presume that the jury would have convicted appellant of aiding and abetting the robbery had it so found.

**26.** To hold otherwise would be to permit appellant, by seeking severance, to use estoppel unfairly "as a sword to prevent the government from having its one full opportunity to prosecute" the CDM charge. *Bailin*, 977 F.2d at 278.

mined that [appellant] did not aid and abet the robbery" *in any way*, or that he did not engage in *any* activity that might constitute aiding and abetting; we can say only that the jury necessarily found that appellant did not aid and abet the robbery *in the manner the government sought to prove and argued he did in the first trial.* In this situation, i.e., "where an acquittal cannot be definitively interpreted as resolving an issue in favor of the defendant with respect to a remaining charge, the [government] is free to commence with trial as it wishes." *States*, 938 A.2d at 1021.

As the trial court appeared to recognize, whether the government will be able to prove that appellant committed CDM in some way not foreclosed by the limitations described above is a matter of some doubt. As the court put it, "whether or not the Government's case will survive an MJOA [motion for judgment of acquittal]" "raises

a different issue[.]" Conceivably, however, Special Agent Nieves's testimony and other evidence the government might marshal could persuade the jury that appellant encouraged the younger man Parada to commit robbery simply by being present and available to carry out the role of an established gang member, by watching to see whether Parada "ha[d] the heart to commit [the] crime[ ] in furtherance of the gang."[27] Or, the jury might find that appellant was more active, e.g., that appellant was among those who told Parada "what [he] needed to do, ... expect[ing] that [as a] prospective [member, Parada] would go out and do that" (even if appellant took no active role during the robbery on May 31, 2011).[28] Asking the jury to find that appellant encouraged or assisted the robbery in these ways would not be asking them to resolve factual issues that the first jury already resolved,[29] even

---

**27.** We note that the defense theory during the first trial was that appellant "either ... was not there at all" during the robbery, "or, if he was, he was merely present and not participating in the robbery." This underscores the possibility that, in acquitting appellant, the jury in the first trial in no way found that appellant was absent from the scene during the robbery. Thus, the acquittal is not inconsistent with appellant having been present and having merely watched to see whether Parada "had the heart" to take Garcia-Lopez's money. Appellant asserts that Nieves "did not describe any role that could be characterized as a passive observer" (and argues that appellant would be prejudiced if the government is permitted to introduce such a previously undisclosed theory of guilt). We disagree. Nieves described the possibility that a prospective gang member might "just take it upon their own to go out and commit that crime while the other people are watching."

**28.** The government emphasizes that an individual can also be found guilty of CDM if he merely "allow[s]" or "permit[s]" a minor to engage in some felony criminal conduct, and that this is another way in which it may be able to prove that appellant committed CDM

as to Parada (and another way the jury in the first trial was not asked to consider). Appellant argues, however, that the verbs "allow" and "permit" as used in the CDM statute suggest that there must be some type of special relationship between the defendant and the minor who committed the delinquent act (such as in the case of a parent who permits his child to be truant from school); absent such an implicit requirement, appellant contends, the CDM statute could effectively create an affirmative duty for innocent bystanders to prevent minors from committing crimes—something there is no evidence the legislature intended. We need not resolve this issue now.

**29.** To be sure, asking the jury to find that appellant assisted the robbery by telling Parada "what [he] needed to do" could involve a finding that appellant in some way assisted in planning the robbery. However, we conclude that collateral estoppel does not preclude the government from urging such a finding (if the government is able to marshal testimony to support it). The jury in the first trial heard no evidence that appellant helped to plan the robbery and thus cannot be said to have "definitely determined" that issue. (Garcia-Lo-

though such conduct might qualify as aiding and abetting. "[F]ederal decisions have made clear that the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book, but with realism and rationality." *Felder*, 548 A.2d at 65 (internal quotation marks omitted). We think this means, in part, not standing on the fact that the jury in the first trial acquitted appellant of aiding and abetting, but looking to the evidence and to the points urged by the government during the first trial to determine what evidence the jury must necessarily have rejected as proving aiding and abetting.

\* \* \*

To summarize, although appellant did, by winning severance, waive double-jeopardy protection from prosecution for CDM, he did not waive the shield of collateral estoppel. Accordingly, the government is estopped from re-litigating whether appellant assisted in the armed robbery in the ways the complainant asserted, and the government argued, he did in the first trial. The government is free, however, to attempt to prove that appellant committed

CDM by acting in other ways that satisfy the elements of that offense, even if the conduct would also constitute aiding and abetting robbery.

For the foregoing reasons, the ruling of the trial court denying the motion to dismiss the CDM charge is hereby

*Affirmed.*

pez "suppose[d]" that Pablo Joya, Ramirez, and Parada "must have some sort of plan," but the court sustained an objection to such testimony, admonishing Garcia–Lopez to "just answer the question asked and not guess as to what was going on.")

And, contrary to appellant's argument, allowing the government to present such evidence and argument would not contravene the holding of *Harris v. Washington*, 404 U.S. 55, 92 S.Ct. 183, 30 L.Ed.2d 212 (1971). *Harris* held that the government could not bring a second prosecution necessitating proof that the defendant was the perpetrator of a bombing where the issue of the identity of the bomber had already been resolved in defendant's favor in a prior trial involving a different victim. *Id.* at 56, 92 S.Ct. 183 (noting that the government "concedes that the ultimate issue of identity was decided by the jury in the first trial"). The Court so held notwithstanding the fact that an evidentiary ruling specific to the first trial had prevented the jury from considering "all relevant evidence." *Id.* at 56, 92 S.Ct. 183. We agree with the government that here, by contrast, the issue of whether appellant in any way invited, solicited, recruited, assisted, supported, caused, encouraged, enabled, inducted, advised, incited, facilitated, permitted, or allowed Parada to commit the robbery was not fully resolved in the first trial. Moreover, as the government points out, *Harris*, a pre-*Jeffers* case, "does not address the situation where the exclusion of evidence from the first trial resulted from the defendant's election of separate trials" and where the trial court "intentionally set[ ] aside evidence for the challenged count and then sever[ed] at the defendant's behest."